**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| ELIZABETH J. MITCHELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 11-cv-367-GKF-TLW |
| | ) | |
| CITY OF BARTLESVILLE, Oklahoma, | ) | |
| a municipal corporation, and | ) | |
| BARTLESVILLE FOP LODGE No. 117, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This matter comes before the court on plaintiff's motions for summary judgment (Doc. ##44, 46), defendant City of Bartlesville's motion for summary judgment (Doc. #45), and Bartlesville FOP Lodge No. 117's motion for summary judgment (Doc. #43).

### I.   **Procedural Background**

Bartlesville, Oklahoma Police Sergeant Elizabeth Mitchell ("Mitchell") filed her Complaint in June 2011, alleging (1) Title VII hostile work environment; (2) Title VII gender discrimination; (3) Freedom of Information Act ("FOIA") violations; (4) public disclosure of private information; (5) tortious interference with the right to contract; and (6) intentional infliction of emotional distress. Compl. (Doc. #2) (June 13, 2011). On November 23, 2011, Mitchell brought a second lawsuit against defendant City of Bartlesville, Oklahoma ("City"), alleging (1) Title VII hostile work environment; (2) Title VII gender discrimination; and (3) Title VII retaliatory practices. (Doc. #2 in Case No. 11-cv-737-GKF).

In this case, the City filed a motion to dismiss the FOIA, tortious interference, public disclosure, and IIED claims. (Doc. #8). Defendant Bartlesville FOP Lodge No. 117 ("FOP") filed a motion to dismiss all claims. (Doc. #9). The court dismissed the public disclosure, tortious

interference, and IIED claims without prejudice to being reasserted in an amended complaint. (Doc. #15) (Mar. 2, 2012). The court dismissed the FOIA claim because FOIA does not apply to municipalities, but gave plaintiff leave to include an Oklahoma Open Records Act claim in an amended complaint. *Id.* The court denied FOP's motion to dismiss the Title VII hostile work environment claim. *Id.*

Days later, this court dismissed Mitchell's second lawsuit as impermissible "claim-splitting," and explained "Plaintiff may add her retaliation claim to her upcoming First Amended Complaint in Case No. 11-cv-367-GKF." (Doc. #13 in Case No. 11-cv-737-GKF) (N.D. Okla. Mar. 7, 2012). Mitchell filed the now-operative First Amended Complaint, limiting her claims to (1) Title VII hostile work environment; (2) Title VII gender discrimination; and (3) Title VII retaliatory practices. (Doc. #18) (Mar. 15, 2012). Mitchell did not restate her dismissed claims or make an Oklahoma Open Records Act claim. *Id.*

## II.   Uncontroverted Facts

Mitchell was hired as a Bartlesville Police Department ("BPD") police officer on July 10, 1995. (Doc. #45 at 10; Doc. #56 at 1). Mitchell was promoted to Detective on January 20, 2005 and to Sergeant on December 15, 2006. Def. Bartlesville's Mot. For Summ. Judg. (Doc. #45 at 11);  Pl.'s Resp. to Def. Bartlesville's Mot. For Summ. Judg. (Doc. #56 at 2).

**Promotional Process.** The BPD's promotional process is specifically outlined in the Collective Bargaining Agreement between the City and the FOP. (Doc. #45 at 10; Doc. #56 at 1). First, an applicant for Lieutenant must serve three years as a Sergeant before being eligible to be promoted. 2009-2010 Collective Bargaining Agreement, Art. 26, §2 (Doc. #45-4 at 26); (Doc. #45 at 11-12; Doc. #56 at 2). Second, an applicant must score at least 70% on the written exam given each January or February to be eligible. (Doc. #45 at 10; Doc. #56 at 1). Those who pass the written exam advance to the oral review. *Id.* After the written and oral reviews, the

applicants' scores are tabulated and each individual is awarded additional points based on seniority. (Doc. #45 at 11; Doc. #56 at 2). Candidates are ranked by score, and the candidates list remains in effect until the next year's testing occurs. *Id.* If a position comes open, the Chief of Police may select among the top three eligible candidates. *Id.*

**BPD Reorganization.** As of October 1, 2008, the BPD organizational chart included a Chief of Police, two Captains, five Lieutenants and eight Sergeants. (Doc. #45 at 12; Doc. #56 at 2). On October 4, 2008, Chief of Police Thomas Holland began to reorganize the BPD staff. *Id.* Jay Hastings's position as Investigations Lieutenant became a Captain position, and Holland appointed Hastings to Captain rank. *Id.* As of October 4, 2008, the revised structure included three Captains and four Lieutenants – three shift Lieutenants and a Drug Task Force Lieutenant. *Id.*

**2009 Lieutenant Promotional Process.** In 2009, two applicants qualified to be on the candidates list: Sergeants Mitchell and Ickleberry. *Id.* Drug Task Force Lieutenant Rick Silver retired effective February 27, 2009. *Id.* At that time, neither Mitchell nor Ickleberry had served three years as Sergeant, and thus neither could be promoted. *Id.* On May 1, 2009, Ickleberry became eligible for promotion and was promoted to Lieutenant. (Doc. #45 at 13; Doc. #56 at 3). On December 15, 2009, Mitchell became eligible to promote but no position was open. *Id.*

**2010 Lieutenant Promotional Process.** On January 27, 2010, the annual written exam for Lieutenant was given, and the 2009 promotional list expired. *Id.* Plaintiff failed the written exam in 2010 and was not eligible for promotion that year. *Id.*

**2011 Lieutenant Promotional Process.** On January 31, 2011, Mitchell passed the written exam along with Sergeants McClintock and Morrow. *Id.* After the oral review, the overall scores ranked Sergeant Morrow first, Mitchell second, and McClintock third. *Id.* After a

Lieutenant retired, Chief Holland had discretion to choose among the three highest scoring eligible officers. (Doc. #45 at 11; Doc. #56 at 2). As was his usual custom, he appointed the applicant with the highest score – Sergeant Morrow. (Doc. #45 at 13; Doc. #56 at 3). No other Lieutenant positions came open in 2011. (Doc. #45 at 14; Doc. #56 at 3).

**2012 Lieutenant Promotional Process.** Mitchell chose not to take the 2012 exam, and thus was not eligible for promotion during 2012. *Id.*

**EEOC Charge and Mitchell's Journal**. On April 27, 2010, Mitchell filed an EEOC Charge of gender discrimination and retaliation. (Doc. #46-1 at 34-39). On March 16, 2011, the EEOC issued a Right to Sue Notice on allegations contained in the Charge. First Am. Compl. (Doc. #18 at 15). After filing her EEOC Charge, Mitchell began writing a journal that recounted past and present grievances related to her employment. *See* Mitchell Dep. at 178:3-14   (Doc. #45-2 at 46). The 155 page journal describes 93 incidents during her 18 years of employment at BPD. (Doc. #45-1). Mitchell had handwritten notes she used in preparing the typewritten journal. She destroyed the notes after typing the journal. *See* Mitchell Dep. at 174:2-9, 178:3-14 (Doc. #45-2 at 45-46). Most entries do not identify when the events took place; and none identify when they were written. (Doc. #45-1). On October 20, 2011, Mitchell filed an Intake Questionnaire with the EEOC. The Questionnaire references additional alleged acts of retaliation. (Doc. #46-1 at 29-33). Later that same day, the EEOC issued a Right to Sue Notice on allegations contained in the Intake Questionnaire. (Doc. #18 at 16).

III.   <u>Legal Issues</u>

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   Federal Rule of Civil Procedure 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails

to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). A court must examine the factual record in the light most favorable to the party opposing summary judgment. *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995).

When the moving party has carried its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted). In essence, the inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

At the summary judgment stage, the party contesting an asserted fact must "support the assertion by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations…, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1); *Mountain Highlands, LLC v. Hendricks,* 616 F.3d 1167, 1170 (10th Cir. 2010). And the court "need consider only the cited materials." Fed. R. Civ. P. 56(c)(3). Thus, the court will not consider allegations from plaintiff's complaint that are not supported by evidence in the summary judgment record.

### A.  Mitchell's journal is not admissible evidence for summary judgment purposes.

Mitchell provides many arguments, but little *admissible evidence* at the summary judgment stage. Mitchell's motions for summary judgment contain the following record evidence:

- 4 pages of her deposition transcript (Doc. #44-1 at 2-4; Doc. #46-1 at 2-5),

- 5 pages of Chief Holland's deposition transcript (Doc. #44-1 at 5-9; Doc. #46-1 at 6-10),

- The FOP Executive Board letter addressing Mitchell's filed grievance concerning the 2009 Lieutenant promotion process (Doc. #44-1 at 10-11),

- A November 1, 2007 letter signed by nine officers supporting retaining Chief Holland after his term as Interim Chief ended (*id.* at 12),

- 18 pages of Mitchell's journal (Doc. #46-1 at 11-28), and

- Mitchell's EEOC Charge and her later Intake Questionnaire (*id.* at 29-39).

In response to defendants' motions for summary judgment, Mitchell attached the following record evidence:

- 128 pages of Mitchell's journal (Doc. #55-1 at 1-128; Doc. #56-1 at 1-128).

- The Promotions section of the 2011-2012 Collective Bargaining Agreement (Doc. #55-1 at 129-131; #56-1 at 129-131), and

- 2 pages of Chief Holland's deposition transcript (Doc. #55-1 at 132-133; Doc. #56-1 at 132-133).

Mitchell provides no affidavits, declarations, stipulations, or admissions. And Mitchell provides no deposition evidence other than Chief Holland's and her own. Thus, the great bulk of the evidence cited is her journal.

Mitchell's journal is not admissible evidence at trial or at summary judgment. The journal is "a statement that the declarant does not make while testifying at the current trial or hearing" and Mitchell offers it as "evidence to prove the truth of the matter asserted." Fed. R. Evid.

801(c). That is inadmissible hearsay. The journal is testimony as it was created under circumstances which would lead an objective observer reasonably to believe it might be used in future legal proceedings. *Cf. Parle v. Runnels*, 387 F.3d 1030, 1037 (9th Cir. 2004) (permitting admission of murder victim's diary because it was not testimonial). Mitchell began typing the current journal sometime after filing her April 27, 2010 EEOC Charge, although she relied on now-destroyed handwritten notes about some of the previous incidents. *See* Doc. ##45-1; 50-2 at 46. The foundational hearsay risks are readily apparent here. The journal relies on Mitchell's perception, is based on possibly defective memories, consists of ambiguities, and is susceptible to distortions or omissions. *See* Wright & Miller, The Hearsay Dangers, 30 Fed. Prac. & Proc. Evid. § 6324 (1st ed.). While such documents might be used to refresh a witness's recollection, they cannot be admitted as evidence unless a hearsay exception applies.

No enumerated hearsay exception applies. Mitchell suggests no hearsay exception in her briefs. *See* Doc. ##44, 46, 51, 52, 55, 56, 59. At the April 9, 2013 motions hearing, plaintiff's counsel offered the justification that statements by superior officers recounted in the journal were admissions against interest.[1] Fed. R. Evid. 801(d)(2). Where the journal provides statements by BPD officers, it is hearsay within hearsay and the party admission exclusion would only cure the second level of hearsay. Thus, if Mitchell had provided a sworn affidavit or deposition testimony that she heard a superior officer making a statement, then the exception might allow the statement into evidence. But the journal is not an affidavit. Therefore, plaintiff has not identified any hearsay exception that would permit the journal to be admitted as evidence.

---

[1] Party admissions and statements against interest are two separate hearsay exceptions. *Compare* Fed. R. Evid. 801(d)(2) (excluding opposing party statements from hearsay definition) *with* Fed. R. Evid. 804(b)(3) (excluding statements against interest by non-parties when the declarant is unavailable). Because plaintiff makes no allegations regarding the unavailability of any witness, the court presumes counsel was referring to the hearsay exclusion of party admissions.

Finally, plaintiff does not argue the residual exception applies, but if she had, the journal does not contain any indicia of reliability that might permit it to be admitted under that exception. Fed. R. Evid. 807. The entries are mostly self-serving interpretations of actions taken by the City and the FOP. Plaintiff has not authenticated any entries via affidavit. And neither the court nor defendants can compare the typewritten journal to previous handwritten notes to assess any transcription errors, modifications, and/or whether Mitchell made contemporaneous notes as to a particular alleged incident. Most entries do not note the date they were written and do not include the date of the alleged incidents. The exception does not apply. Fed. R. Evid. 807(a).

Because the journal is not admissible, plaintiff's proffer of evidence at the summary judgment stage is minimal. In response to defendants' motions, plaintiff must provide "specific facts that would be admissible in evidence in the event of trial" to show a rational trier of fact could find for her. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998); *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1537 (10th Cir. 1995) ("He or she must go beyond the pleadings and establish, through admissible evidence, that there is a genuine issue of material fact that must be resolved by the trier of fact."). And in the absence of specific record citations, the court will not "search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury." *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 125 (10th Cir. 1992).

**B.  The Court Grants Summary Judgment To Defendants On The Title VII Gender Discrimination Claim**

Mitchell asserts a Title VII claim based on a failure to promote and alleges that defendants discriminated against her because of her gender by ensuring she could not advance. (Doc. #18 ¶26). Mitchell does not provide direct evidence of discrimination, so the court must apply the *McDonnell–Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting analysis

when reviewing her claim. Plaintiff first must establish a prima facie case of gender discrimination. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013). This requires the plaintiff to produce evidence raising a genuine issue of material fact that: "(1) she belongs to a protected class; (2) she applied for an available position for which she was qualified; (3) she 'was rejected under circumstances which give rise to an inference of unlawful discrimination.'" *Id.* (quoting *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

If the plaintiff establishes a prima facie case of gender discrimination, the burden shifts to defendants to come forward with a legitimate, non-discriminatory reason for any adverse employment action. *Id.* at 1216-17. This is a burden of production, not persuasion. *Young v. Dillon Cos., Inc.,* 468 F.3d 1243, 1249 (10th Cir. 2006). If the defendants provide a legitimate, non-discriminatory reason for their actions, the burden shifts back to the plaintiff to show that the defendants' explanation is pretextual. *Id.*

Here, Mitchell properly alleges she is a member of a protected class. Whether Mitchell applied for an available position she was qualified for and whether she was rejected under circumstances which give rise to an inference of unlawful discrimination are considered case-by-case for the three separate years she could have been promoted. As discussed below, Mitchell fails to make a prima facie case for the years 2009 and 2010. She states a prima facie case for 2011, but provides no evidence that defendants' non-discriminatory reason for not promoting her was pretextual.

1) *2009 Failure to Promote*

BPD's promotion procedure for aspiring Lieutenants complicates this inquiry. An officer must begin the promotion process in January or February to qualify for promotion at any time during the following year. An officer may take the requisite written and oral exams even if he or she has not served the requisite three years before being eligible for a promotion at the time of

test. The top three scores are placed on a candidates list. And when a position becomes open, the Chief of Police may select among those candidates. Chief Holland's custom is to select the highest scoring officer for promotion.

In January 2009, Sergeants Mitchell and Ickleberry passed the exams. Because she had not served three years at her current rank, Mitchell was ineligible to be promoted. Thus, unless where was an opening during the brief time between her three year anniversary as a Sergeant – December 15, 2009 – and the January 27, 2010 test date, she could not be promoted. No Lieutenant positions were open during the brief time Mitchell was eligible for promotion. And after the 2010 test, the new test scores determined a new candidates list.

Mitchell argues that various superior officers conspired to ensure no Lieutenant position was open when she was eligible to be promoted. Chief Holland reorganized the BPD staff structure in October 2008 by making the Investigations Lieutenant position a Captain position and promoting Lieutenant Hastings to the new Captain position. The reorganization increased the number of Captains from two to three and lowered the number of Lieutenants from five to four. Sergeants Mitchell and Ickleberry were the only 2009 candidates for Lieutenant. Neither was eligible for promotion when Lieutenant Silver's position was opened in February 2009 because neither had served three years as a Sergeant. The position remained open until Ickleberry became eligible on May 1, 2009. Mitchell acknowledges that "that Ickleberry was promoted because he was eligible in May (not for urgency of need)." (Doc. #56 at 8). After Ickleberry's promotion, any vacancy in 2009 would have been filled by Mitchell when she became eligible on December 15, 2009. However, after the reorganization, none of the four Lieutenant positions were vacant during the six weeks she was eligible.

From Mitchell's perspective, two Lieutenants left office between October 2008 and February 2009 and only two officers were going to be eligible in 2009 to fill those spots. When she tested in January 2009, BPD had not informed the FOP or officers of the reorganization, and Mitchell understandably expected she would obtain one of the two Lieutenant positions. But plaintiff does not contest that BPD's reorganization left the Department with only four Lieutenant positions as of October 4, 2008. (Doc. #45 at 13 (Fact #22); Doc. #56 at 3 (agreeing with Fact #22)). And the FOP Executive Board's letter addressing plaintiff's grievance makes clear that Mitchell knew before she became eligible on December 15, 2009 that the position no longer existed:

> I would like to add, prior to November 12th 2009 you came to me, and I advised you then I did not feel the Lieutenants [sic] position you referred to was still available. I referred you to the contract and pointed out the position was not there. Lt. Rick Silver held the position you are in reference to, which was in the drug task force at the time of his retirement. He retired in March of 2009. If you will look at the budget paper work you gave me at the time, it shows there are 4 lieutenants' [sic] position for the 2009-2010 budget, which went into affect [sic] on July 1st of 2009. Again, you were not eligible for promotion until 12-15-2009.
>
> We conducted a meeting with an attorney via telephone conference call on November 12th, 2009. At the completion of that phone conservation you were advised by the attorney, **you did not have a grievance**…

Doc. #44-1 at 11 (emphasis in original). Regardless of plaintiff's awareness of the reorganization, neither Lieutenant position was open during the six weeks she was eligible to be promoted.

Plaintiff fails to make a prima facie case of gender discrimination based on the failure to promote in 2009. Mitchell was not qualified to be promoted from January 2009 through December 15, 2009 because she had not served three years as Sergeant. And there was no position open after December 15, 2009 when she became eligible. Because Mitchell was never qualified for an open position, she has not made a prima facie case.

Additionally, defendants have met the burden to come forward with a legitimate, nondiscriminatory reason for not promoting plaintiff. Specifically, the staff reorganization left no Lieutenant position vacant during her brief period of eligibility. And the Lieutenant opening filled on May 1, 2009 was filled by the only then-eligible officer.

Mitchell argues that defendants' legitimate, non-discriminatory reasons for not promoting her are pretext for unlawful discrimination. At this stage of the proceeding, the burden shifts to plaintiff to show that defendants' explanation for not failing to promote is pretextual. *Plotke v. White*, 405 F.3d 1092,1099 (10th Cir. 2005); *Salguero v. City of Clovis*, 366 F.3d 1168, 1176 (10th Cir. 2004). "A plaintiff demonstrates pretext by showing... that the employer's proffered explanation is unworthy of credence." *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1218 (10th Cir.2003) (quoting *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1455 (10th Cir. 1994)). A plaintiff typically attempts to satisfy his burden by "revealing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.'" *Mackenzie v. City & County of Denver*, 414 F.3d 1266, 1278 (10th Cir. 2005) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)). A plaintiff's "mere conjecture" that the employer's explanation is pretext is not a sufficient basis to deny a motion for summary judgment. *Branson v. Price River Coal Co.*, 853 F.2d 786, 772 (10th Cir. 1988).

Mitchell suggests that promoting Ickleberry instead of keeping the Lieutenant position open for seven more months to allow her to become eligible is evidence of gender discrimination. And she alleges the staff reorganization was part of a conspiracy to ensure she was not promoted. (Doc. #56 at 8). Neither allegation is supported by anything other than Mitchell's "mere conjecture." *Branson*, 853 F.2d at 772. "Plaintiff argues that there is evidence

suggesting that defendant's explanation for [failing to promote] is unworthy of belief, but [s]he fails to provide any evidence in support of this argument." *Thomas v. City of Bartlesville, Okla.*, 2012 WL 2412157 at *9 (N.D. Okla. June 26, 2012). Therefore, even if Mitchell could make a prima facie case, she has not provided evidence that defendants' non-discriminatory reason for not promoting her was pretextual.

### 2)  *2010 Failure to Promote*

Mitchell was ineligible for promotion in 2010, as she took the written exam on January 27, 2010 but did not obtain the required seventy percent. (Doc. #45 at 13; Doc. #56 at 3). Mitchell has not made a prima facie case that the failure to promote in 2010 was due to gender discrimination.

### 3)  *2011 Failure to Promote*

Mitchell passed the written exam on January 31, 2011 along with Sergeants McClintock and Morrow. After the oral and written scores were tabulated, Morrow obtained the highest score, followed by Mitchell and then McClintock. When Lieutenant Peterson retired on August 20, 2011, Chief Holland appointed Morrow as the highest scoring, eligible applicant. Mitchell asserts that Morrow's success was due to "a concerted effort between Holland and Peterson… to coach Morrow so his score would be higher than Plaintiff's" because they did not want a female Lieutenant. (Doc. #56 at 3).

Plaintiff states a prima facie case because she was qualified for the available position and was rejected under circumstances that give rise to an inference of unlawful discrimination. *Tabor*, 703 F.3d at 1216. Defendants, however, present a legitimate non-discriminatory reason for the lack of promotion: the highest scoring applicant was selected. Moreover, defendants provide evidence that choosing the highest scoring applicant is standard practice. Holland Aff. ¶21 (Doc. #45-6 at 2).

Mitchell cites no evidence that this explanation is pretextual. First, Mitchell provides no evidence that Morrow received coaching other than her bare allegation. Moreover, Mitchell provides no evidence that the alleged coaching was motivated by gender bias or a desire to not promote a female to Lieutenant. The allegations are supported nothing other than Mitchell's "mere conjecture." *Branson*, 853 F.2d at 772.

During the time Mitchell had sufficient seniority to be eligible for promotion to Lieutenant, she was never the top scoring applicant when a position became open. Given the Collective Bargaining Agreement's procedures and Chief Holland's practice of promoting the highest scoring eligible applicant when openings arose, Mitchell was never in the right place at the right time to be promoted. The lack of summary judgment evidence controverting these basic facts belies her gender discrimination claim. Defendants' motions for summary judgment as to plaintiff's Title VII gender discrimination claims are granted.

## C. The Court Grants Summary Judgment To Defendants On The Hostile Work Environment Claim

To establish a hostile work environment claim, Mitchell must prove: (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment. *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007).

To survive summary judgment on a hostile work environment claim, "a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Penry v. Federal Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998) (quoting *Davis v. United States*

*Postal Service*, 142 F.3d 1334, 1341 (10th Cir. 1998)).  Courts must determine whether an environment is sufficiently hostile or abusive by "looking at all the circumstances**,** including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998).  "Simple teasing," offhand comments, and isolated incidents (unless extremely serious) do not amount to discriminatory changes in the "terms and conditions of employment."  *Id.* at 788.  The Court in *Faragher* stated:

> These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code. Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing. We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment...

*Id.* (quotations and citations omitted).  The Tenth Circuit, in applying this test, has stated:

> A plaintiff does not make a showing of a pervasively hostile work environment by demonstrating a few isolated incidents of [gender-based] enmity or sporadic [gender-based] slurs. Instead, there must be a steady barrage of opprobrious [gender-based] comments.

*Semsroth v. City of Wichita*, 304 F. App'x 707, 722 (10th Cir. 2008) (citing *Tademy v. Union Pac. Corp.*, 520 F.3d 1149, 1162 (10th Cir. 2008)).

Here, plaintiff provides only her own unsworn journal entries as evidence. (Doc. #56-1). These entries are inadmissible hearsay. *See supra* §III.A. Thus, plaintiff provides no *admissible* evidence to support plaintiff's allegations that she was subjected to a hostile work environment because of her gender, and defendants are entitled to summary judgment on this claim.

Additionally, even if the journal entries were accepted as summary judgment evidence, the court agrees with *plaintiff's* summary that "[c]ompared with the statement discussed in *Penry* and in other hostile environment cases, the comments Plaintiff relied upon appear neither

pervasive nor severe." (Doc. #56 at 11). A rational jury could not find the few journal entries that contain sexual innuendo or gender-based content were sufficiently severe or pervasive to constitute an objectively hostile work environment. In addition to not providing any summary judgment evidence to support her claims, plaintiff does not identify which of the 93 journal entries support her hostile workplace claim. *See* Doc. #56. Based on the court's review, it appears the most relevant entries are:

- Entry No. 1: A male officer's attempted to date plaintiff in 1995;

- Entry No. 18: BPD officers commented on plaintiff's sister's breasts after meeting plaintiff's sister in a bar;

- Entry No. 20: Plaintiff alleges a superior officer photographed plaintiff's buttocks during investigation of traffic accident in 1997;

- Entry No. 32: Plaintiff alleges officer LeBlanc asked plaintiff if her breasts were real after seeing photos of plaintiff in a bikini and fitness gear that plaintiff allowed a local business to use in 2002;

- Entry No. 51: FOP President commented at FOP meeting that new facial hair regulations governing mustaches and goatees applied to plaintiff as well;

- Entry No. 87: Plaintiff was once incorrectly rotated to bottom of list used to assign additional shifts and was denied additional shifts as a result.

*See* Doc. #45-1.[2] The allegation of a superior officer photographing plaintiff's backside is perhaps the most severe, but the uncontroverted evidence shows that despite the superior officer

---

[2] In other journal entries, Mitchell often asserts incidents were motivated by gender-based animus although they do not facially suggest such animus. *See* Doc. #45-1 (Entry No. 8 – assignments to lectures for children; Entry No. 10 – officer passed gas in her direction; Entry No. 33 – before being promoted to Sergeant, plaintiff was told by unnamed FOP members that she was not eligible to be promoted due to her gender; Entry No. 34 – fellow officer said she was promoted to Sergeant because she was female; Entry No. 36 – superior officer sent joking email that "a heat rash does not place [an officer] in any protected class"; Entry No. 38 – Sergeants were excluded from supervisor meetings; Entry No. 43 – plaintiff not selected for Special Operations Team; Entry No. 52 – plaintiff overheard fellow officer comment about his penis to another officer while wearing a catheter bag for medical purposes; Entry No. 53 – at City awards ceremony, female human resources employees gave Chief Holland and City Manager Ed Gordon

disputing plaintiff's recounting of the facts, the BPD "severely reprimanded" the supervising officer. (Doc. #45-9 at 2). Given plaintiff's 18 years of service, these incidents are not sufficiently pervasive or severe to permit the issue to go to a jury. And the BPD responded to the most severe accusation with a proper reprimand. Thus, even if the journal could be considered summary judgment evidence, the court grants summary judgment to defendants on the hostile work environment claim.

### D. The Court Grants Summary Judgment To Defendant City On The Retaliation Claim

To establish a prima facie case of retaliation under Title VII, plaintiff must demonstrate that she "(1) she engaged in protected opposition to Title VII discrimination or participated in a Title VII proceeding; (2) she suffered an adverse employment action contemporaneous with or subsequent to such opposition or participation; and (3) there is a causal connection between the protected activity and the adverse employment action." *Cole v. Ruidoso Municipal Schools*, 43 F.3d 1373, 1381 (10th Cir. 1994). "Where there is no direct evidence of retaliation, we analyze a retaliation claim under the *McDonnell Douglas* burden-shifting framework." *Stover v. Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004).

Here, plaintiff cannot establish a prima facie case because she fails to identify an adverse employment action. Title VII protects individuals "not from all retaliation" but only from retaliation "that produces an injury or harm." *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1087 (10th Cir. 2007).

---

awards that consisted of their faces superimposed on photographs of Dog the Bounty Hunter and Dog's wife; Entry No. 54 – fundraising solicitation over BPD email included enticement that department head could be required to cross-dress for one hour; Entry No. 85 – plaintiff was disciplined for leaving the jurisdiction while on duty but fellow officer was not punished when he did not ensure sufficient manpower on a shift that plaintiff took for him).

> Although we will liberally construe the phrase adverse employment action, the action must amount to a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or… causing a significant change in benefits. Mere inconveniences or alterations of job responsibilities do not rise to the level of an adverse employment action.

*Stover*, 382 F.3d at 1071 (internal citations omitted). Mitchell identifies the following possible adverse employment actions after she filed her EEOC Complaint on April 27, 2010:

- The City's verbal warnings increased (Doc. #56 at 13);

- Plaintiff was falsely accused of speeding, not showing up to court and using the City's computer for personal use (*id.*);

- Bartlesville requested a meeting to determine whether plaintiff was "mentally competent" to perform her duties (Doc. #45-1, Entry No. 37);

- Plaintiff was forced to transfer to a night shift in January 2011 (*id.*, Entry No. 57);

- Plaintiff lost her preferred days off in September 2011 (*id.*, Entry No. 65);

- Plaintiff was counseled after sending an email to supervisors informing them that another supervisor had misinterpreted a law (*id.*, Entry No. 88);

- Plaintiff was called before a review board related to an emergency pursuit in June 2012 and cleared of any wrongdoing (*id.*, Entry Nos. 89-90);

These allegations do not include a materially adverse employment action.

First, these allegations have no support in the summary judgment evidence. In a similar situation, the Tenth Circuit found that where there was "no evidence in the record, apart from [plaintiff's] deposition testimony…. [Plaintiff's] unsupported assertions… 'carry no probative weight in summary judgment proceedings." *Tapia*, 170 F. App'x at 534 (quoting *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)). "[Her] mere subjective belief" is insufficient to "preclude the grant of summary judgment." *Id.*

Second, even the allegations fail to show any change in pay, benefits, or job other than, possibly, the transfer to night shift. Basically, there was "[n]o change in [her] employment status

occurred: [her] job, pay and benefits at all times remained the same." *Tapia v. City of Albuquerque*, 170 F. App'x 529, 534 (10th Cir. 2006). Defendants do acknowledge Mitchell was transferred to night shift more than seven months after she filed her EEOC complaint and before filing her lawsuit. (Doc. #45 at 37). However, given the undisputed fact that the BPD has the right to organize and transfer officers as it sees fit, Mitchell's transfer was not an adverse employment action.

Moreover, even if the transfer to night shift is considered to be an adverse employment action, Mitchell has not provided any evidence of pretext concerning the defendants' non-discriminatory explanation that the shift changes were departmental in scope and affected other officers. (Doc. #45 at 38). Indeed, when asked what evidence Mitchell has that the department-wide shift changes were retaliatory against her, she responded "I have no evidence." Mitchell Dep. at 334:17-19 (Doc. #45-2 at 85). Thus, even if Mitchell could make a prima facie case for retaliation concerning the transfer to night shift, the court grants summary judgment to defendant City on the retaliation claim.

## IV.  Conclusion

WHEREFORE, the defendant Bartlesville's Motion for Summary Judgment (Doc. #45) is granted and defendant FOP's Motion for Summary Judgment (Doc. #43) is granted. Plaintiff's motions for summary judgment (Doc. ##44, 46) are denied. The pending motions in limine (Doc. ##42, 50) are moot.

DATED this 11th day of April, 2013.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT